UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RASHIED K. GOODWIN,** | **Civil Action No. 12-1040 (FLW)** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **STATE OF NEW JERSEY, et al.,** | |
| **Defendants.** | |

<u>**WOLFSON, United States District Judge:**</u>

I.     <u>**INTRODUCTION**</u>

Before the Court is a Motion for Summary Judgment by Defendants, Detectives Edward
Conway, David Lissner, and Randy Sidorski (collectively "Defendants" or "Moving
Defendants"), on Plaintiff Rashied K. Goodwin's ("Plaintiff") claims against them for false
arrest/imprisonment and malicious prosecution pursuant to 42 U.S.C. § 1983.

As explained in more detail in the fact section of this Opinion, Plaintiff was arrested
pursuant to a warrant and prosecuted for allegedly selling heroin to an undercover officer and a
confidential informant ("CI") in Watchung, New Jersey on October 16, 2009.  The investigation
leading to Plaintiff's arrest and prosecution was conducted by the Moving Defendants, who are
members of the Organized Crime and Narcotics Task Force ("Task Force"), which is organized
within the Somerset County Prosecutors Office (the "Prosecutor's Office").  Defendants were
investigating an individual using the alias "Snipe" who sold heroin on two separate occasions:
first to a Confidential Informant ("CI") on ▮▮▮▮▮, 2009, in the presence of Defendant Lissner
(the "first buy"); and second to Lissner directly on October 16, 2009 (the "second buy").  Nearly
a month after the drug buys, Defendants prepared an Affidavit/Certification in Support of

Probable Cause ("Affidavit") to secure an arrest warrant against Plaintiff for the October 16, 2009 drug buy.  Defendants contend that they came to believe that Plaintiff was the individual "Snipe" based on (1) an identification by Detective Lissner, and (2) information from a Plainfield Police Department Sergeant suggesting that Plaintiff may be the individual known as "Snipe."  Plaintiff contends, however, that he could not have made the first buy on ████████ 2009 because he had been arrested by Plainfield Police on September 26, 2009 and was immediately incarcerated and detained from September 26, 2009 through October 2, 2009, the ██████████████.  Notably, Plaintiff contends that at the time Defendants prepared the Affidavit of Probable Cause to arrest him for the October 16, 2009 drug buy, they had the Plainfield Booking Sheet ("Booking Sheet") in their possession and even included it with the supporting documents for the Affidavit.  The charges against Plaintiff were ultimately dismissed after his defense attorney pressed the prosecutor to provide the exact date of the first buy.  The particular details of the investigation, the Affidavit of Probable Cause, and the dismissal of the charges are described below.

For the reasons expressed herein, the official capacity and supervisory claims against the Moving Defendants are dismissed with prejudice.  The Defendants' motion is otherwise denied without prejudice.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### a.  Factual Background

#### i.  The Investigation

At some point prior to September 27, 2009, the Task Force began an investigation into the alleged sale of drugs by an individual going by the alias of "Snipe" in the Watchung and North Plainfield area.  (DSMF ¶ 6.)  Detective Conway engaged a CI to aid in the investigation

of "Snipe."  (*Id.*)  Prior to, or on, ███████, 2009, the CI contacted "Snipe" in order to set up a

buy where an undercover officer would also accompany the CI for the sale.  (DSMF ¶ 8;

Plaintiff's Responsive Statement of Material Facts ("RSMF") ¶ 9.)   None of the Defendants

were part of the conversation between the CI and "Snipe." (*Id.*)

The first buy between the CI and "Snipe" occurred on ███████, 2009, at about 3:30

p.m., at the Sears parking lot on Route 22 in Watchung, New Jersey. (*Id.*).   Although there was

initially some confusion about the date on which the first buy occurred, the date and time of the

first buy are not disputed for purposes of this motion.[1]   (*See* DSMF ¶ 9; RSMF ¶ 9.)

Detective Lissner, serving in an undercover capacity, joined the CI in the Sears parking

lot in a vehicle. (DSMF ¶¶ 11-12.)  Detective Lissner was in the driver's side seat and the CI was

in the passenger's side seat. (*Id.* ¶ 14.) Two black males approached the car from the front and

the CI identified one of the men as "Snipe." (*Id.* ¶ 13.) "Snipe" approached the passenger's side

of the car and placed his head through the window. (Id. ¶ 16.)  In a quick exchange, "Snipe"

dropped a packet of what appeared to be heroin into the CI's lap in exchange for money and

Detective Lissner asked "Snipe" whether or not the detective could make future buys with

"Snipe" without the CI present. (*Id.* ¶¶ 16-18.) "Snipe" confirmed that would be fine and then

left. (*Id.* ¶ 19.)  There is no evidence indicating that "Snipe" was followed after the buy, although

Detective Conway testified that if "Snipe" had been followed an investigation report would

---

[1] The exact date of the first buy was not used in the reports prepared by Defendants; instead, the date is described as occurring the "week of" September 27, 2009.  Defendants contend that the "week of" date is used to protect the identity of the confidential informant.  The reports themselves, however, are dated.  Detective Conway's report, however, is dated ███████, 2009 and Detective Lissner's report is dated October 5, 2009.  (*See* CM/ECF No. 49-3, Ex A.)  It is undisputed that the "Voucher for Payment of Information and Purchase of Evidence" ("Voucher") for sixty dollars, which was prepared by Defendant Conway, establishes the date and time of purchase as ███████, 2010 at approximately 3:30 p.m.  (*See* CM/ECF 43-20, Ex. R.)

likely have noted it. (RSMF ¶ 21)  There is conflicting evidence about whether Snipe left the scene in a car or on foot, but Detectives Conway and Shearer indicated that Snipe was traveling in the general direction of Plainfield.  (RSMF ¶ 21.)

Through a series of text messages with "Snipe," Detective Lissner set up a second buy with "Snipe" for October 16, 2009, at around 3:00 p.m. in the same Sears parking lot.  (DSMF.¶¶ 27-28.)  While Detective Lissner was on route to the Sears parking lot, he received a call from "Snipe" wanting to know where he was and to let the Detective know that "Snipe" was already at the Sears. (Id. ¶ 29.)  After parking, Detective Lissner observed "Snipe" approach his vehicle from behind and enter the car through the front passenger's side door.  (*Id.* ¶¶ 32-33.)  "Snipe" handed Detective Lissner a bundle of heroin and was given $60 in exchange.  (*Id.* ¶ 36.)  Detective Lissner testified that the second sale lasted "[t]hirty seconds maybe, give or take." (CM/ECF No.43-6, T107:4.)  Neither Detective Conway, who observed both sales, nor Detective Sidorski, who observed the second sale, took any pictures or video of "Snipe" in order to help with later identification of "Snipe," nor were they close enough to observe identifying details of "Snipe." (CM/ECF No.43-5, Tr. 57:19-25; CM/ECF No.43-8, Tr. 41:23-25, Tr. 49:1-10.) (Pl. RSMF ¶ 61.)  Following the exchange, Defendants observed "Snipe" exiting the parking lot in a car and proceeding along Terrill Road in the direction of Plainfield. (DSMF ¶ 38.)  Snipe was not arrested at that time and no one on the surveillance team followed "Snipe" out of the lot. (RSMF ¶ 39.)

Defendants' report associated with the first buy contain very little identifying information about "Snipe." For example, Detective Conway's Investigation Report states that "'Snipe' is described as a black male, dark complexion, approximately 5'8", thin build, and approximately 30 years old." (RSMF ¶ 60) (emphasis added).  The report does not state that Detective Conway

observed the suspect himself. (*Id.*)  Detective Lissner, who had the closest and most detailed view of "Snipe" while he served as an undercover, did not include any physical description of "Snipe" in his report of the first buy other than "black male." (Id. ¶ 61.)  Detective Lissner's report from October 16, 2009 likewise contains no information about the physical appearance of Snipe, including any scars, tattoos, or any other physical descriptors. [2]  (*Id.* ¶ 61.) Detective Lissner testified that if there was something noticeable about the suspect, it would likely have been included in the investigation report. (CM/ECF No.43-6, Tr. 64:22-67:1.)  It is undisputed that Mr. Goodwin has scars and tattoos on visible areas, including his face, hands, and arms. (CM/ECF No.43-7, T46:12-47:12; Kaspar Cert, Ex. A, JUD108 (Plainfield Booking Sheet).) Detective Lissner also testified that he did not recall noticing any distinguishing marks, scars, tattoos, or clothing during his second sale, nor does his report from his second sale include any additional physical descriptions of "Snipe." (CM/ECF No.43-6, Tr. 104:8-19; CM/ECF No.43-15, p. 7.) (Pl. RSMF ¶ 62.)

On or before November 13, 2009, the Defendants worked to identify "Snipe." (RSMF ¶ 54; CM/ECF 49-3, Ex. A at 10.)  It is not clear how the Task Force came to determine that Snipe resided in the Plainfield Area.  (*See* CM/ECF No. 49-3, Ex. A at 10 (stating that "it was determined that "Snipe" resided in the Plainfield area.)  Sergeant Shearer, who was the supervisor of Detective Conway, contacted a Lieutenant O'Brien in the Plainfield Police Department, with whom he had a long-standing working relationship. (DSMF ¶¶ 40-41.)  During the course of this conversation, Lieutenant O'Brien stated to Sergeant Shearer that he knew Rashied Goodwin as "Snipe." (DSMF ¶¶ 46-49.)  Lieutenant O'Brien testified that he had

---

[2] Detective Sidorski's report from the October 16, 2009 sale likewise contains no description of Snipe other than "black male." (CM/ECF No. 49-3, Ex. A.)

interacted with Mr. Goodwin approximately six times, but could not recall in his deposition how he came to associate the nickname of "Snipe" with Plaintiff. (RSMF ¶¶ 45-46.)

Following Sergeant Shearer's conversation with Lieutenant O'Brien, a mug shot of Mr. Goodwin was obtained from Union County Correctional Facilities via email, and Detective Conway printed the digital photograph.[3]  (DSMF ¶¶ 48, 54; CM/ECF 49-3, Ex. A at 10.) On November 13, 2009, Detective Conway presented Detective Lissner with the photograph of Mr. Goodwin for identification. (DSMF ¶¶ 55, 57.)  In his deposition, Detective Lissner stated that he was shown the photograph and immediately recognized the person in the photograph as "Snipe" (DSMF ¶ 56), but he did not recall much about the circumstances of that conversation or the photograph itself.[4]  (RSMF ¶ 56.)  Lissner testified that he initialed and dated the photograph to confirm that he identified Plaintiff as Snipe.  (DSMF ¶ 57.) Defendant Lissner testified that he "would not have signed a document signifying that that [sic] was the individual unless [he] was a hundred percent sure." (CM/ECF No. 43-6, Tr. 119:20-22; Pl. RSMF ¶ 57.)

---

[3] The parties dispute whether Officer Conway could have obtained a driver's license photograph of Plaintiff from the Motor Vehicle Commission.  (DSMF ¶¶ 51-53; RSMF ¶¶ 50-53.)

[4] For example, Detective Lissner does not recall the quality of the photograph, whether it referenced Union County Department of Correctional Services, where he was at the time he was shown the photograph, what was said to him upon presentment of the photograph, and what his reaction was to the photograph. (*Id.*, *see also* Kaspar Cert, Ex. D, Interrog. No. 22 ("Defendant states that Detective Conway presented and showed the photograph to him on November 13, 2009. Defendant does not recall the exact dimensions of the photograph, whether it was in color or black and white, or whether the label identifying it as being from the Union County Department of Corrections Services was visible when the photograph was shown.").)  Likewise, Detective Conway does not recall the circumstances or conversation with Detective Lissner when he showed him the photograph.  (RSMF ¶ 59.)

### ii. **Affidavit of Probable Cause**

The Affidavit/Certification in Support of Probable Cause was executed by Detective Conway on the same day. (RSMF ¶ 63.)  The Affidavit itself refers only to the second buy on October 16, 2009 and reads as follows:

> On October 16, 2009, an undercover detective purchased ten (10) bags of heroin from Goodwin in exchange for a sum of US currency.  The suspected heroin was field tested and yielded a positive reaction for heroin content.  The total amount of heroin seized weighed less than one-half ounce.  It should be noted that the undercover narcotics transaction took place within 1000 feet of Mount Saint Mary's High School.

(DSMF ¶ 65, Ex. N.) The Affidavit was submitted with a packet of supporting documents.  It is undisputed that the signed investigation reports created by Defendants Conway and Lissner describing both the ██████, 2009 and October 16, 2009 drug buys and the photograph of Goodwin from Union County Jail with Detective Lissner's initials were submitted with the Affidavit as supporting documents.

The parties, however, dispute whether the Booking Sheet was in Defendants' possession at the time they filed the Affidavit of probable cause or whether it was acquired later.  Plaintiff contends that Defendants not only possessed the Booking Sheet at the time they prepared the Affidavit but that they also included the sheet with the documentation to support the Affidavit. (RSMF ¶ 63; Ex. A at JUD108.)

Little is known about when the Booking Sheet became part of the casefile.  In Defendant Conway's deposition, the following exchange occurred between Plaintiff's attorney and Detective Conway regarding whether the Booking Sheet was included in the supporting documents submitted with the Affidavit:

> Q.      Okay. JUD108, I was just -- if you could explain why the Plainfield Police booking sheet was included?

7

A.      I'm trying to think when this was
included.

Q.      Just for the record, this is all
part of Conway-17.

A.       Let me take a look at it.
Okay. I'm sorry, what was your
question?

Q.      I was just -- if you could explain
why it was included in the packet of supporting
documents for the affidavit of probable cause.

A.      Right. Because this Plainfield
booking sheet was added to the case file
because the whole contention was, as we later
learned -- not at the time, we learned -- or it
was reported that this was -- it was not a
positive identification, because this
individual was in -- this Rashied Goodwin was
incarcerated at the time, to some degree, and
could not have met with our guy. "Our guy" --
I'm sorry, pejorative. Our detective.
So this was added into there, and
the fact that we learned from Plainfield Police
Department that he was arrested. I believe he
was over at Mountainside as well. Mountainside
P.D., the police department there.

Q.      Okay. Is it common to include
booking sheets or –

A. No. This was -- but it was a
unique case in the fact that the voucher
document came into play, into existence when
that's really something that -- in efforts not
to jeopardize confidential informants,
that's -- we put aside as not divulged, so
again going back to -- because the reports look
like the week of and, no, that couldn't have
been initially, because he was incarcerated.
However the voucher showed that it was
███████████ and it was approximately 3:30 p.m.,
and he did meet with our undercover.

8

(Conway Tr. 130:20-132:12.)  Conway later appears to agree that the Booking Sheet was included with the supporting documents for the Affidavit.  (*See* Conway Tr. 134:6-135:6.)

The Booking Sheet appears in roughly the middle of the packet of supporting documents. (Ex. A at JUD108.)  The Booking Sheet immediately follows Detective Conway's November 13, 2009 Supplementary Investigative Report. (CM/ECF No. 49-3, Ex. A at 10-11.)  The Booking Sheet itself is undated but indicates that Plaintiff was arrested on September 26, 2009.  (*Id.* at 11) Notably, the "Offender Disposition" is listed as "JAILED," and the line next to the heading "Time bailed or released:" is blank, suggesting that the form itself may have been generated when Plaintiff was still in custody.  (*Id.*)  Notably, the Booking Sheet also lists Plaintiff's alias as "SNIPE."[5]  (*Id.*)

Like the date of the first buy, there was initially some confusion regarding the date on which Plaintiff was released from jail, but it now appears largely undisputed that Plaintiff was incarcerated from September 26, 2009 until sometime on October 2, 2009.[6] (Pl. RSMF ¶ 9; DSMF ¶ 85). █████████████████████████████████████████████████████ As to the timing of his release from custody, Plaintiff testified in his deposition that he was "almost positive it was nighttime" when he was released from Union County Jail on October 2, 2009 and that he went to his mother's house after he was released.  (CM-ECF No. 43-7, Ex E, Pl.

---

[5] These facts, including Plaintiff's alleged alias and the absence of release date on the Booking Sheet, offer some support for Plaintiff's contention that Defendants had the Booking Sheet in their possession while preparing the Affidavit and included the Booking Sheet to support the Affidavit of Probable Cause.  Plaintiff testified in his deposition, however, that he has never used the alias "Snipe." (DSMF ¶ 72.)

[6] Some of this confusion may have stemmed from the fact that Plaintiff was moved from Mountainside Jail to Union County Jail on October 1, 2009.  (CM/ECF No. 43-7, Pl. Tr. 65:8-16.)

Tr. 49:7-15; 65:8-25.)  Defendants have not cited to specific evidence or testimony to suggest

that Plaintiff was released earlier in the day on October 2, 2009.

### iii.   The Dismissal of the Charges

After his arrest, Plaintiff was indicted by a Somerset County Grand Jury on January 20,

2010 for knowingly or purposely distributing heroin contrary to N.J.S.A. § 2C:35-5a(1) and

N.J.S.A. § 2C:35-5b(3), and distributing heroin while within 1000 feet of school property

contrary to N.J.S.A. § 2C:35-7.  (DSMF 68.)   Plaintiff acknowledges that he did not tell his

public defender Matthew Katzenbach that he was in jail during the first buy until several months

after his arrest (DSMF ¶ 69).[7] Because Plaintiff contends that Defendants possessed the

Plainfield Police Department Booking Sheet prior to his arrest and included the Booking Sheet in

support of the Affidavit of Probable Cause, Plaintiff  disputes that Defendants (1) were unaware

of Plaintiff's alibi prior to his arrest and (2) learned of Plaintiff's alibi only after being informed

by Plaintiff's public defender.

After learning of Plaintiff's alibi, Plaintiff's public defender sent a letter to the Assistant

Prosecutor, Merrill Mezzacappa, on February 3, 2010, asking Ms. Mezzacappa for the date of the

first sale during the week of September 27, 2009, explaining that the date was vital to Mr.

Goodwin's defense. (RSMF ¶ 82, Kaspar Cert. Ex. B.)  Ms. Mezzacappa responded by letter

dated February 8, 2010 that the date of the first sale would not be provided.  (RSMF ¶ 82, Kaspar

---

[7] Plaintiff contends that when was arrested on for the relevant offenses on November 25, 2009, he was already custody on other charges at that time. (RSMF ¶ 66.) Thus, he did not learn of the charges from the Somerset County Prosecutor's Office until the end of December 2009 when he was released from custody and then taken back into custody by Somerset County. (*Id.*) As such, Plaintiff contends that he was not aware that he was in custody for the relevant charges until the end of December 2009.

Cert., Ex. C.)  On June 24, 2010, Mr. Katzenbach wrote to Ms. Mezzacappa, stating the following:

> As you are aware, [Plaintiff] has put forth an alibi with regard to the first alleged sale of CDS.  It is my understanding that you have confirmed that he was incarcerated from September 27 through October 2, 2009.
>
> You may recall that I sought from you the exact date of the sale, which you indicated you would not do out of concern for your informant.  The discovery indicates that the sale occurred during the week of September 27, 2009.  That week lasted from Sunday September 27, 2009 until Saturday, October 3, 2009.

(CM/ECF No. 43-25, Ex. W.)  Mr. Katzenbach further asserted that Plaintiff's defense sought the exact date of the sale out of concern that "the date of the sale might be changed to suit the alibi term."  (*Id.*)  He further pointed out that due to Plaintiff's incarceration, "logic dictates [that the] sale must have occurred on October 3, 2009" and again sought to have Ms. Mezzacappa confirm the exact date of the sale.  (*Id.*)

Following this series of exchanges between Ms. Mezzacappa and Mr. Katzenbach regarding the release of the date of first sale (DSMF ¶¶ 87-88), Ms. Mezzacappa sent a letter dated July 1, 2010 to Mr. Katzenbach, copying the Honorable Paul W. Armstrong.  In this letter she stated that "[t]o maintain confidentiality and protect the identity of the informant, my office is unwilling to risk revealing the informant's identity and we are therefore dismissing the indictment." (DSMF ¶ 89.)

Subsequently, on July 2, 2010, Judge Armstrong signed an order dismissing the indictment.  (DSMF ¶¶ 93-95.)  When Ms. Mezzacappa stated that she wished to dismiss the indictment for the reasons memorialized in the July 1, 2010 letter and asked the Court to read the letter into the record, the Court stated the following: "I shall.  <u>This is what we had been talking about earlier, as far as an alibi</u>?"  (CM/ECF No. 43-11 (emphasis added).)  In response to the

Court's question, Ms. Mezzacappa informed the court that she did not believe Mr. Goodwin had an alibi and then moved for dismissal based on the reasons memorialized in her July 1, 2010 letter.  Ms. Mezzacappa asked the Court to read the letter into the record, which the Court did. (*Id.*)  There were no further substantive discussions on the record at the hearing regarding Mr. Goodwin's alibi.  (CM/ECF No. 43-11, at 4.)

### b.  Procedural History

Plaintiff, proceeding *pro se*, filed his Complaint on February 22, 2012 (CM/ECF No. 1) and an Amended Complaint on March 13, 2012.  (CM/ECF No. 2).  The Amended Complaint named the State of New Jersey, the Somerset County Prosecutor's Office, Detective Edward Conway, Detective David Lissner and Detective Randy Sidorski as defendants. (CM/ECF No. 2). The Court entered an Order on August 13, 2012, dismissing Plaintiff's Amended Complaint with prejudice against the State of New Jersey and the Somerset County Prosecutor's Office. (CM/ECF No. 8).  Plaintiff served the remaining Defendants Conway, Lissner, and Sidorski on September 13, 2012. (CM/ECF No. 10; CM/ECF No. 11; CM/ECF No. 12).  On October 4, 2012, the Defendants filed an Answer. (CM/ECF No. 14).  The Defendants filed a Motion for Summary Judgment on August 7, 2013. (CM/ECF No. 20).  The Court denied the Defendants' Motion for Summary Judgment without Prejudice on March 25, 2014. (CM/ECF No. 21; CM/ECF No. 22).  On July 25, 2014, the Court appointed the law firm, Lowenstein Sandler, to represent Plaintiff, *pro bono*.  (CM/ECF No. 25).  The Plaintiff filed a Second Amended Complaint on December 16, 2014 (CM/ECF No. 38), alleging claims of false imprisonment, malicious prosecution, and supervisory liability pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  The State filed a Motion for Summary Judgment on March 27, 2015.  (CM/ECF No.43).  Plaintiff

filed his opposition brief through counsel on April 20, 2015 (CM/ECF No. 49) and the State filed its reply brief on April 23, 2015.  The matter is now fully briefed and ripe for disposition.

### III.   ANALYSIS

#### a.   Standard of Review

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  *Celotex*, 477 U.S. at 330.  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  *Gleason v. Norwest Mortg.*, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  The non-moving party must

present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted). Under *Anderson*, Plaintiff's proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255. To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted); *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokle*y, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### b.  The State's Arguments in Favor of Summary Judgment

The State makes four arguments in favor of summary judgment. First, the State argues that Plaintiff cannot meet the favorable termination requirement for its malicious prosecution claim because the prosecutor dismissed the indictment to protect the identity of the confidential informant and not because Plaintiff was innocent. Second, the State argues that there was

probable cause to arrest Plaintiff, and, thus, his claims for false arrest/false imprisonment and malicious prosecution cannot survive summary judgment.[8]  Third, the State argues that Defendants are entitled to Eleventh Amendment immunity.  Fourth, the State argues that the Defendants are entitled to qualified immunity.[9]   The Court addresses each argument separately.

### c.  Disputed Issues of Fact Preclude Summary Judgment on the Issue of Favorable Termination

To prevail in a Section 1983 action malicious prosecution action, a plaintiff must show:

> (1) the defendants initiated a criminal proceeding;
>
> (2) the criminal proceeding ended in the plaintiff's favor;
>
> (3) the proceeding was initiated without probable cause;
>
> (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and
>
> (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.[10]

*Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).  Defendants take the position that Plaintiff cannot prevail on his malicious prosecution claim because he cannot establish the

---

[8] In his Amended Complaint, Plaintiff alleges claims of false imprisonment and malicious prosecution against Defendants Conway, Lissner, and Sidorski.  False arrest and false imprisonment "are 'nearly identical claims,' and 'are generally analyzed together.' "*Brockington v. City of Philadelphia*, 354 F.Supp.2d 563, 571 n. 8 (E.D. Pa. 2005) (quoting *Maiale v. Youse*, No. Civ. A. 03–5450, 2004 WL 1925004, at *12 (E.D. Pa. Aug, 27, 2004)). Nonetheless, they are still distinct claims: "[t]he basis for false arrest is the arrest itself, whereas the basis for false imprisonment is the detention that follows the false arrest." *Reedy v. Twp. of Cranberry*, No. 2:06CV1080, 2007 WL 2318084, at *3 (W.D. Pa. Aug. 9, 2007).

[9] The State also argued that it was entitled to summary judgment on Plaintiff's claims of supervisory liability under section 1983.  Plaintiff concedes that summary judgment on the supervisory claims is warranted.  (CM/ECF No. 50, Pl. Br. at 32.)   As such, the supervisory claims are dismissed with prejudice.

[10] For purposes of summary judgment, the State challenges only elements two and three, *i.e.*, favorable termination and probable cause. The Court therefore assumes for purposes of this motion that Plaintiff can establish the remaining elements of a malicious prosecution claim.

element of favorable termination where the prosecutor allegedly dismissed the charges to protect the identity of the CI and not because she believed Plaintiff had an alibi or was innocent of the charges.  (D. Br. at 13-16.)  Plaintiff argues that a dismissal to protect a confidential informant qualifies as a favorable termination and that Defendants fail to address the unique circumstances surrounding Assistant Prosecutor Mezzacapa's abandonment of the charges.  (Pl. Br. at 22-23.)

The "favorable termination requirement . . . exists 'to avoid 'the possibility of the claimant [sic] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction.'"  *Malcomb v. McKean*, 535 F. App'x 184, 186 (3d Cir. 2013) (citing *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009) (alteration in original) (quoting *Heck v. Humphrey*, 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)).  To avoid such a conflicting outcome, the prior disposition of the criminal case must show "the innocence of the accused." *Id*; *see also Kossler*, 564 F.3d at 188 (no favorable termination where the acquittal on one charge was accompanied by a conviction on a contemporaneous charge in the same proceeding based on the same facts).

In this case, the prosecutor dismissed the charges against Plaintiff prior to trial.  It is well established that "formal abandonment of the proceedings by the public prosecutor[,]" may satisfy the favorable termination prong.  *Id. (*citing *Kossler*, 564 F.3d at 187; however, "[a] nol pros signifies termination of charges in favor of the accused 'only when their final disposition is such as to indicate the innocence of the accused.'" *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (quoting Restatement (Second) of Torts: Indecisive Termination of Proceedings § 660, cmt. a); *see also Hector v. Watt*, 235 F.3d 154, 156 (3d Cir. 2000) (malicious prosecution plaintiff must be innocent of the crime charged in the underlying prosecution)); *see also*

16

*Malcomb v. McKean*, 535 F. App'x 184, 185-86 (3d Cir. 2013) (favorable termination established where prosecutor "request[ed] that a *Nolle Prosequi* be granted as to the entire Information[ ] and criminal complaints for the reason: In the interest of Justice").

Typically, a dismissal of charges based on insufficient evidence of guilt is considered a favorable termination. *See Hilfirty v. Shipman*, 91 F.3d 573, 579–80 (3d Cir. 1996) (applying Pennsylvania law). In *Hilfirty v. Shipman*, 91 F.3d 573, 579–80 (3d Cir. 1996), the Third Circuit reversed the dismissal of a malicious prosecution claim and held that "a grant of *nolle prosequi* is insufficient to support a claim of malicious prosecution only in circumstances where the accused herself enters into a compromise with the prosecution in which she surrenders something of value to obtain the dismissal," or in cases in which "the accused formally accepts the grant of *nolle prosequi* in exchange for her knowing, voluntary release of any future claims for malicious prosecution." *Id.* at 575 (emphasis added) (*disapproved of on other grounds* by *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 794 (3d Cir. 2000).); *see also Pittman v. Metuchen Police Dep't*, No. 08–2373, 2010 WL 4025692, at *7 (D.N.J. Oct. 13, 2010) ("If the prosecutor drops the charges as part of a compromise with the accused, the accused will fail the favorable termination prong ...."); *see also Malcomb*, 535 F. App'x at 186 ("Our precedent is clear. A *nolle prosequi* disposition is a favorable termination unless the accused has entered into a compromise or surrendered something of value to obtain that outcome.).

To support its argument that Plaintiff cannot meet the favorable termination requirement, the State relies in large part on the Third Circuit's decision in *Donahue v. Gavin*, 280 F.3d 371, 384 (2002). In *Donahue*, the Superior Court of Pennsylvania reversed the judgment entered against Donohue and remanded for a new trial due to the failure of the trial judge to give a "corrupt and polluted source" charge to the jury. *Id.* at 384. Although the County District

Attorney had the option to retry Donohue, she moved to *nolle prosequi* because the accused had already served jail time and if convicted, would most likely not receive any additional jail time. *Id.* The Court of Appeals analyzed the prosecutor's request for *nol pros* and reasoned that "[f]ar from indicating [ ] innocence, the *nol pros* merely reflected an informed and reasoned exercise of prosecutorial discretion as to how best to use [ ] limited [judicial] resources .... Accordingly, there is no way that [the complainant] can establish the malicious prosecution that is necessary to establishing the constitutional violation he has alleged as a basis of his § 1983 civil rights claim ...." *Id.*

Although the Court in *Donahue* analyzed the prosecutor's request for *nol pros* in determining whether the final disposition indicated the plaintiff's innocence, nothing in *Donahue* requires the Court to cabin its analysis of the favorable termination prong to the prosecutor's request for *nol pros* and the order dismissing the charges where there is additional record evidence available. Instead, the Third Circuit requires that the factual circumstances giving rise to the final disposition must be capable of sufficiently supporting a finding of actual innocence before it can be said that the charges have terminated in the plaintiff's favor. *See, e.g., Kossler*, 564 F.3d at 194 (explaining fact intensive nature of the favorable termination analysis generally and in the specific context of multiple charges); *DiFronzo v. Chiovero*, 406 F. App'x. 605, 609 (3d Cir. 2011.) In *DiFronzo v. Chiovero*, 406 F. App'x at 609, for example, the Third Circuit emphasized that Plaintiff failed to establish favorable termination because he failed to present "any information indicating the innocence of the accused." *Id.* (internal citations omitted.) The Court explicitly noted that neither the order granting the *nolle prosequi* dismissal "nor any other matter in the record," shed any light on why the motion was filed or granted. *Id.*

Here, there are disputed issues of material fact regarding why the charges against Plaintiff were dismissed. Although the reason put on the record by Ms. Mezzacappa suggests that she dismissed the charges solely to protect the identity of the confidential informant, the record as a whole, including (1) the letters back and forth between the prosecutor and Plaintiff's defense attorney, and (2) Judge Armstrong's reference to off-the-record discussions of Plaintiff's alibi in the hearing transcript, indicates that the prosecutor and Judge Armstrong were well aware of Plaintiff's claim that he had an alibi and was incarcerated during the first buy. A jury could infer from the evidence that, despite her proffered reasons, Ms. Mezzacappa abandoned the criminal proceedings against Plaintiff, at least in part, due to the insufficiency of the evidence and on the basis of Plaintiff's alibi. Further, the letters exchanged between Plaintiff's defense counsel and the prosecutor reveal that Plaintiff maintained his innocence up until the dismissal of the charges, and the State has offered no facts to suggest that Plaintiff entered into a compromise of any kind with the State or knowingly gave up his right to bring a future claim in exchange for the dismissal. *See Vazquez v. City of Atlantic City*, No. 12-1752, 2014 WL 2920820, at *9-10 (D.N.J. Jun. 27, 2014) (denying summary judgment where there were disputed issues of material fact as to whether Plaintiff stipulated to probable cause when the indictment was dismissed). As such, summary judgment on the malicious prosecution claim for failing to meet the favorable termination requirement is denied without prejudice at this time.

### d. Disputed Issues of Material Fact Preclude Summary Judgment on the Issue of Probable Cause

The State next argues that Plaintiff cannot establish the absence of probable cause. To succeed on a claim for malicious prosecution, a plaintiff must prove that the proceeding against him was "was initiated without probable cause." *Di Bella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005). Likewise, to establish a state or federal claim for false imprisonment or

false arrest, it is necessary to show that the arrest or detention took place in the absence of probable cause. *Murphy v. Bendig*, 232 F. App'x. 150, 153 (3d Cir. 2007); *see also Startzell v. City of Philadelphia*, 533 F.3d 183, 204 (3d Cir. 2008) (explaining that "lack of probable cause" is "a necessary element of a false arrest and malicious prosecution claim"); *Sheedy v. City of Philadelphia*, 184 F. App'x. 282, 284 (3d. Cir. 2006) (stating that probable cause defeats claims for malicious prosecution, false arrest, and false imprisonment).

"[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804, 91 S.Ct. 1106, 1111, 28 L.Ed.2d 484 (1971). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Rogers v. Powell*, 120 F.3d 446,453 (3d Cir. 1997) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480,483 (3d Cir. 1995)). The probable cause determination is made under the totality of the circumstances on the basis of the information known by the officers at the time the arrest was made. *See United States v. Harris*, 482 F.2d 1115,1117 (3d Cir. 1973); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014) ("the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction . . . It is therefore irrelevant in a probable cause inquiry whether a person is later acquitted of the crime for which she or he was arrested").

"The issue of whether there is probable cause is generally a question for the jury; however, 'a district court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorable to plaintiff, reasonably would not support a contrary factual finding[.]'" *Boothby v. Drake*, 441 F. App'x 905, 908 (3d Cir. 2011) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (quoting *Sherwood v. Mulvhill*, 113 F.3d 396, 401

(3d Cir. 1997))); *see also Minatee v. Philadelphia Police Dep't*, 502 F. App'x. 225, 228 (3d Cir. 2012).

At issue here is whether State Defendants had probable cause to obtain the warrant that led to Plaintiff's arrest, imprisonment, and prosecution.  To challenge the validity of an affidavit of probable cause, a plaintiff must make a two-pronged showing pursuant to the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667(1978).[11] Under the *Franks* test, a plaintiff challenging the validity of an affidavit of probable cause must prove, by a preponderance of the evidence, "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Collins v. Christie*, 337 F. App'x. 188, 192 (3d Cir. 2009) (citing *Sherwood*, 113 F.3d at 399 (citing, *inter alia*, *Franks*, 438 U.S. at 171-72, 98 S.Ct. 2674)); *see also Wilson v. Russo*, 212 F.3d 781, 78–87 (3d Cir. 2000); *Roberts v. Ziolkowski*, No. 12–4763 2014 WL 4662255, at *5 (D.N.J. Sept. 18, 2014).

As explained by the Third Circuit "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting."  *Christie*, 337 F. App'x. at 192 (internal citations omitted).   An officer, however, is not required to relate "the

---

[11] The Court notes in this regard that Plaintiff in his Amended Complaint has not alleged a separate claim for false arrest but instead alleges only false imprisonment and malicious prosecution.  Because the State does not contend that the *Franks* analysis is limited to claims for false arrest and because the allegedly wrongful conduct at issue surrounds the Affidavit of Probable Cause, the Court utilizes the *Franks* test to analyze the existence or absence of probable cause.

entire history of events leading up to a warrant application with every potentially evocative detail." *Roberts*, No. 12–4763 2014 WL 4662255, at *5 (citing *Wilson* 212 F.3d at 787).

"To determine the materiality of the misstatements and omissions, [the Court must] excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson*, 212 F.3d at at 789 (internal quotation marks and citation omitted).  Thus, false statements or omissions are "material" if a reconstructed affidavit, containing alleged omissions and excising alleged inaccuracies, would no longer establish probable cause.  *Collins*, 337 F. App'x. at 192 (citing *Wilson*, 212 F.3d at 789).

Here, the Court finds that there are disputed issues of material fact as to whether Defendants, in applying for the warrant, had the Plainfield Booking Sheet in their possession, and thus either had knowledge of or recklessly omitted from the Affidavit of Probable Cause the fact that Plaintiff was incarcerated on the same day as the first buy.[12]

The State appears to argue that (1) Lieutenant O'Brien's suggestion that Plaintiff went by the street name "Snipe" and thus may be the "Snipe" who sold Defendants the drugs and (2) Defendant Lissner's positive identification of Plaintiff as Snipe independently establish probable cause.  Plaintiff vigorously disputes the reliability of the identification made by Defendant Lissner.  The Court need not decide whether the identification made by Defendant Lissner could independently establish probable cause.  This is not the type of case where the testimony of a

---

[12] In its reply brief, the State argues that the Booking Sheet was not included in the documentation to support the Affidavit and cites to the testimony by Detective Conway to establish that the Booking Sheet was added to the case file later.  Based on the Court's review, that testimony regarding the preparation of the Affidavit and supporting documents is unclear at best as to whether the Booking Sheet was included in the supporting documents for the Affidavit or was placed in the case file at a later date. (CM/ECF 43-5, Ex. C, Tr. 130:20-136:17.)

reliable witness or witnesses automatically establishes probable cause.[13]  *See, e.g.*, *Roberts*, No. 12–4763 2014 WL 4662255, at *5-6 (allegedly exculpatory video unnecessary where several witnesses positively identified Plaintiff as the perpetrator).  Where there is plainly exculpatory evidence, such as a blatantly erroneous physical description, reliable DNA conclusively exculpating the alleged perpetrator, or conflicting identifications by multiple eyewitnesses, the police may have a duty to investigate.  *See Wilson*, 212 F.3d at 790.  Moreover, even a victim's identification can be outweighed by independent exculpatory evidence or substantial evidence of a witness's unreliability that is known to the arresting officer.  *Id.*

Here, viewing the facts in a light most favorable to Plaintiff, a reasonable jury could find that the Moving Defendants had the Plainfield Booking Sheet in their possession at the time they prepared the Affidavit of Probable Cause.[14]  That Booking Sheet indicated that Plaintiff was incarcerated on September 26, 2009 and remained incarcerated at the time the sheet was generated.   A reasonable jury could also find that this type of evidence is plainly exculpatory

---

[13] It is well established that when police receive a reliable identification by a victim of his or her attacker, the police have probable cause to arrest. *See, e.g., Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (finding probable cause even though victim accused husband only after identifying different attacker).  Police can assess the victim's demeanor, find the story credible, and rely on the identification to make an arrest. *See Mitchell v. Obenski*, 134 F. App'x 548, 551 (3d Cir. 2005) (asserting that reliable victim identification established probable cause, and opportunity for more thorough investigation does not vitiate the initial probable cause). As explained above, this precept, however, is not absolute.

[14] Defendants cite to the Third Circuit's decision in *Hernandez v. City of Union City*, 264 F. App'x 221, 223 (3d Cir. 2008), which states that "a post-arrest Notice of Alibi is irrelevant where there is no evidence that the officers knew of that alibi at the time of arrest." *Id.* (*See* D. Br. at 24.) The Court does not disagree. Here, however, the Court finds that there are disputed issues of material facts regarding Defendant's knowledge of Plaintiff's alibi at the time the Affidavit of Probable Cause was submitted in support of an arrest warrant.  With respect to *Hernandez*, the Court also notes that although the detective who identified Hernandez saw him for only 10-12 seconds, the detective making that identification "lived on the same street as [Hernandez], had spoken to him several times, and [the Detective] had appeared at [Hernandez' house] because of complaints by [Hernandez's] wife of domestic disputes or harassment." *Id.* at 222.

and seriously undermines Lieutenant O'Brien's belief that Plaintiff may be the same "Snipe" that Defendants were investigating and Defendant Lissner's identification of Plaintiff as "Snipe" who sold him drugs during the investigation.  An affidavit containing the omitted information regarding Plaintiff's incarceration on the date of the first buy would likewise seriously undermine the finding of probable cause as to the arrest and subsequent prosecution of Plaintiff.

The State also argues that Plaintiff cannot rebut the presumption of probable cause that attaches to the subsequent grand jury indictment.   "A grand jury indictment constitutes prima facie evidence of probable cause to prosecute." *Woodyard v. County of Essex*, 514 F. App'x. 177, 183 (3d Cir. 2013) (quoting *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989)). The presumption arises from the regularity that attaches to a grand jury indictment or presentment.  *Rose*, 871 F.2d at 353. This presumption may be rebutted, however, "by evidence that the [indictment or] presentment was procured by fraud, perjury or other corrupt means.'" *Id.*  Here, because the Court has already found that there are disputed issues of fact as to whether the Defendants acted with reckless disregard for the truth earlier in the chain of events when they prepared the Affidavit of Probable Cause and because the State has not disputed for purposes of this motion that Defendants initiated the criminal proceedings, the Court declines to find on summary judgment that Plaintiff cannot rebut the presumption of probable cause that attaches to the subsequent grand jury indictment.

As the Third Circuit recently opined, "Courts should exercise caution before granting a defendant summary judgment in a malicious prosecution case when there is a question of whether there was probable cause for the initiation of the criminal proceeding because, '[g]enerally, the existence of probable cause is a factual issue.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 300 (3d Cir. 2014) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995).  The

Court went on to state that "[i]t is certainly is inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if 'reasonable minds could differ' on whether he had probable cause for the institution of the criminal proceedings based on the information available to him.  *Id.* (finding that District Court erred in entering summary judgment on malicious prosecution claim where the District Court found probable cause to charge plaintiff even in the absence of fabricated confession) (citing *Deary v. Three Un–Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)).  Here, Defendants have not challenged the first element of malicious prosecution – that they instituted the proceedings against Plaintiff – and the Court has found that there are issues of material fact regarding whether Defendants recklessly omitted facts in the Affidavit of Probable Cause.  As such, summary judgment is denied without prejudice on the issue of probable cause.

### e.  The Official Capacity Claims against Defendants Conway, Lissner, and Sidorski are Dismissed with Prejudice.

The State next argues that the Moving Defendants, members of the Somerset County Organized Crime and Narcotics Task Force, are officers of the State, and, like prosecutors performing investigative functions, are entitled to Eleventh Amendment Immunity on the official capacity claims against them. (Def. Opp. Br. at 25-30.)  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985). (holding that Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities).  The Plaintiff counters that Defendants are county detectives and have not met their burden under *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 644, 659 (3d Cir. 1989) to establish that they are state officials entitled to Eleventh Amendment immunity.  (Pl. Op. Brief at 25-30.)  On this record, the Court need not determine whether the Defendants are state officials entitled to Eleventh Amendment immunity because the

official capacity claims against them are subject to dismissal regardless of their status as state or county employees.

Plaintiff's Amended Complaint brings claims against the Moving Defendants in their personal and official capacities.  "Personal-capacity damage suits under section 1983 seek to recover money from a government official, as an individual, for acts performed under color of state law.  Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988); *see Monell v. Department of Social Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Kentucky v. Graham*, 473 U.S. at 166 ("Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"); *Sutton v. City of Philadelphia*, 21 F. Supp.3d 474, 493 (E.D. Pa. 2014) ("A suit against an individual in his or her official capacity 'is not a suit against the official, but rather a suit against the official's office.'" (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304 (1989) and *Kentucky*, 473 U.S. at 165); *Duffy v. Cnty. of Bucks*, 7 F. Supp.2d 569, 578 (E.D. Pa. 1998) (noting that claims against county correctional officers in their official capacities were effectively claims against the county).

State officials are generally not subject to suit for damages in their official capacities because neither states nor arms of the state are "persons" within the meaning of § 1983.[15]  *See, e.g., Bostrom v. New Jersey Div. of Youth and Fam. Servs.,* No. 11–1424 2011 WL 3684817, at *5 D.N.J. Aug. 22, 2011) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Gordon v. Berkeley Twp. Police*, No. 10–5061, 2011

---

[15] As Defendants note, Eleventh Amendment immunity likewise bars suits for damages against state officials in their official capacities.

WL 2580473, at *4 (D.N.J. Jun. 27, 2011) (holding that a "Prosecutor's Office" is an arm of the state and not a "person" within the meaning of a Section 1983 suit) (citations omitted); *Baker v. Lewis*, No. 10–3438, 2010 WL 4117140, at *1 n. 1 (D.N.J. Oct.19, 2010) (same) (citations omitted).  Although local governments are "persons" under § 1983 and can be liable for the actions of their agents, *see Monell*, 436 U.S. at 690, there is no *respondeat superior* liability under § 1983.  *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35–36, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010).  Instead, the local government must have known of its agent's action and approved of it.  *See id.; City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Here, to the extent Defendants are state actors, as the State contends, the official capacity claims against them must be dismissed because Defendants' employer, i.e., the State and/or the prosecutor's office, are not "persons" under section 1983 and cannot be sued for money damages.  To the extent Defendants are employees of Somerset County, as Plaintiff contends, the official capacity claims against them must be dismissed because Plaintiff has not pleaded or proven a theory of *Monell* liability against Somerset County.   Thus, regardless of Defendants' employment status, Plaintiff's official capacity claims against Defendants Conway, Lissner, and Sidorski cannot survive summary judgement and are therefore dismissed with prejudice.

### f.   Defendants Are Not Entitled to Qualified Immunity at this Juncture

The State also argues that Defendants Conway, Lissner, and Sidorski are entitled to qualified immunity.  In support of its argument for qualified immunity, the State contends that Defendants had probable cause to execute the Affidavit for Plaintiff's arrest based on (1) Defendant Lissner's identification of Plaintiff as "Snipe" and (2) the information shared by Lieutenant O'Brien with the taskforce.  The State also contends that Plaintiff cannot show that

the individual Defendants did not have "an honest and reasonable belief that Plaintiff used the alias Snipe." (Id. at 32.) Finally, the State asserts that "there is no evidence in the record that would suggest that the Defendants were aware of any exculpatory evidence at the time of Plaintiff's arrest." (*Id.*) In response, Plaintiff argues that Plaintiff had a clearly established right to be free from an unlawful arrest and thus his "claims for false arrest and malicious prosecution[] rise and fall on the basis of whether or not probable cause existed at the time the warrant was issued." (Pl. Opp. At 31.) Plaintiff contends that Defendants acted with reckless disregard for the truth when they ignored readily available evidence of Plaintiff's alibi and instead relied on a highly suggestive identification by Defendant Lissner. (*Id.* at 31-32.)

Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted). To forfeit qualified immunity, a police officer must violate "clearly established statutory or constitutional right of which a reasonable person would have known." *Kelly v. Borough of Carlisle*, 544 F. App'x 129, 133–34 (3d Cir. 2013) (quoting *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Consequently, the qualified immunity standard is one of "objective legal reasonableness." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The protection of qualified immunity exists "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citations omitted).

In deciding whether a governmental official is entitled to qualified immunity, a court examines: (1) whether the facts alleged make out a violation of a constitutional right; and (2) if so, whether the right at issue was "clearly established" at the time of the defendant's alleged

misconduct.  *See Taylor v. Barkes,* No. 14-939,--- S.Ct. ----, 2015 WL 2464055, at *1-2 (2015)

(internal citations omitted); *Pearson*, 555 U.S. at 232.  Courts are permitted to address either

prong of the analysis first in light of the circumstances at hand.  *See id*.  The defendant bears the

burden to prove qualified immunity.  *See Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d

Cir. 2006) (citation omitted); *Hicks v. Feeney*, 850 F.2d 152, 159 (3d Cir. 1988).

        The Court finds at this juncture that issues of material fact preclude summary judgment

on the basis of qualify immunity.  Although "qualified immunity is an objective question to be

decided by the court as a matter of law," the jury "determines disputed historical facts material to

the qualified immunity question." *Carswell v. Borough of Homestead*, 381 F.3d 235, 242, 243

(3d Cir. 2004).  "Just as the granting of summary judgment is inappropriate when a genuine issue

exists as to any material fact, a decision on qualified immunity will be premature when there are

unresolved disputes of historical fact relevant to the immunity." *Curley v. Klem*, 298 F.3d 271,

278 (3d Cir. 2002); *see also Beers–Capitol v. Whetzel*, 256 F.3d 120, 142 (2001) ("[T]o the

extent that the plaintiffs have made a showing sufficient to overcome summary judgment on the

merits, they have also made a showing sufficient to overcome any claim to qualified immunity.")

        Here, in large part, the qualified immunity question hinges on a material dispute of

historical fact that should be decided by a jury: Did any of the individual Defendants, in

preparing the Affidavit of Probable Cause or initiating the prosecution of Plaintiff, know of or

recklessly disregard the fact that Plaintiff was incarcerated during the time period when the first

buy occurred?  If a jury answers this question in the affirmative with respect to any of the

individual Defendants, those Defendants will not be entitled to qualified immunity.  As such,

Defendants' motion for summary judgment on the issue of qualified immunity is denied without

prejudice.

IV.     **CONCLUSION**

The Court dismisses with prejudice the official capacity and supervisory claims against the

Moving Defendants.  The motion for summary judgment is otherwise denied without prejudice.

An appropriate order follows.

   /s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

Date: June 16, 2015